UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| THE SEARCH OF INFORMATION ASSOCIATED WITH ACCOUNT #5668704 (LYDIA MCKENZIE) THAT IS STORED AT PREMISES CONTROLLED BY ECLINICALWORKS | Case No. __23-mj-23-01-AJ____  <br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

Special Agent, Tyler Gagne, being duly sworn, deposes and says:

I.    **INTRODUCTION AND AGENT BACKGROUND**

1.     I, Tyler Gagne, have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2018 and am currently assigned to the Boston Field Office.  I was previously assigned to the Philadelphia Field Office.  As an FBI Special Agent, I investigate health care fraud including violations of Title 18, United States Code, Sections 1349 and 1347, among others, along with the distribution of controlled substances including violations of Title 21, United States Code, Sections 846, 843, and 841(a)(1), among others.

2.     I have investigated and participated in the investigations and prosecutions of doctors, pharmacists, and drug dealers.  I have written, sworn to, and executed numerous search warrant affidavits.  I have directed cooperating witnesses to conduct consensual recordings and assisted other investigators conducting consensual recordings during which prescriptions and prescription drugs have been illegally purchased from doctors, pharmacists, and other unlicensed individuals.  I have testified before the grand jury in cases involving the illegal diversion of prescription drugs.

3.     Investigations for the distribution of controlled substances often focus on licensed doctors, pharmacists, or other health care professionals, who sell prescriptions for controlled substances to purported "patients," who are actually addicts and/or drug dealers.  My

1

investigations, and those carried out by investigators with whom I have worked, have also involved other federal criminal laws related to money laundering, currency structuring, and tax evasion.

4.     Prior to employment with the FBI, I served as a police officers for eleven years: six years with the York (Maine) Police Department, where I served as a patrol officer, domestic violence investigator, and arson investigator; and one-and-one-half years with the State of New Hampshire Division of Liquor Enforcement, where I served as an investigator, fire arms instructor, and prosecuted my own criminal cases in District Court; and three-and-one-half years with the City of Manchester (New Hampshire) Police Department, where I served as a patrol officer and field training officer. I graduated from Saint Anselm College with a Bachelor of Arts degree in Criminal Justice in 2007. I have attended the State of Maine Criminal Justice Academy, the State of New Hampshire Law Package at the State of New Hampshire Police Academy, and the FBI Academy in Quantico, Virginia.

5.     The FBI, along with the Drug Enforcement Administration ("DEA"), the Department of Health and Human Services Office of Inspector General ("HHS-OIG"), the New Hampshire Department of Justice, Medicaid Fraud Control Unit ("MFCU"), and the Department of Justice, Criminal Division, are investigating Lydia McKenzie, DNP, PMHNP-BC ("MCKENZIE") for violations of federal law—including violations of 21 U.S.C. § 841(a)(1) (illegal drug distribution), and 18 U.S.C. § 1347 (health care fraud)—related to her practices affiliated with: (i) Weeks Medical Center located at 173 Middle Street, Lancaster, New Hampshire; (ii) North Country Healthcare Patient Care Center Colebrook (in partnership with Weeks Medical Center) located at 181 Corliss Lane, Colebrook, New Hampshire; (iii) Weeks at Mt. Eustis Center located at 260 Cottage Street, Littleton, New Hampshire; (iv) The Doorway at Androscoggin Valley Hospital located at 7 Page Hill Road, Berlin, New Hampshire; (v) Northstar Wellness

Associates, PLLC located at 171 Daniel Webster Highway, Unit 11, Belmont, New Hampshire; and (vi) any other affiliated clinics or locations ("PRACTICE LOCATIONS").

6.     MCKENZIE is an addiction-medicine practitioner who is authorized to treat up to 275 office-based opioid addiction patients under the Drug Addiction Treatment Act of 2000 ("DATA").  Such practices and its patients are exceptionally protected by statutory restrictions relating to the disclosure and use of alcohol and drug abuse patient records.

7.     I am personally involved in this investigation along with other federal agents.  The statements contained in this affidavit are based upon a review of both public and private records, prescription data and Medicare and Medicaid claims data, subpoena returns, undercover operations, and interviews conducted by me and other federal agents of witnesses knowledgeable about the facts underlying this investigation.  Because this affidavit is provided for the limited purpose of establishing probable cause for a search warrant, it does not include every known fact concerning this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause.

8.     This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a) and (c) and Rule 41 of the Federal Rules of Criminal Procedure in an ongoing federal criminal investigation into MCKENZIE, authorizing the search of information and records maintained with eClinicalWorks ("eClinical" or **TARGET LOCATION**), an electronic health records vendor (as more fully described in Attachment A of this affidavit), to seize the fruits, evidence, and instrumentalities of criminal conduct (as more fully described in Attachment B).

9.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that, from or around January 1, 2019, and continuing through the present, in the District New Hampshire and elsewhere, MCKENZIE has violated 21 U.S.C.

§ 841(a)(1) (illegal drug distribution), 42 U.S.C. § 1320a-7b (payment and receipt of illegal kickbacks), and 18 U.S.C. § 1347 (health care fraud) (collectively the "TARGET OFFENSES"). Specifically, this investigation relates to MCKENZIE's involvement in illegal drug distribution and drug diversion by prescribing controlled substances outside the scope of usual medical practice to individuals with no legitimate need for the controlled substances, many of whom engage in drug-seeking behavior, as well as for submitting claims to Medicare and Medicaid for medically unnecessary services.

10.     As a result, there is probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES are located at the **TARGET LOCATION** and currently in the possession of eClinical.

## II.   **BACKGROUND**

### a.   **Legal Background**

#### The Controlled Substances Act

11.     The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensing of controlled substances in the United States.  *See 21* U.S.C. § 801 *et seq*.  It is a federal offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorization by law.  *See* 21 U.S.C. § 841(a)(1).  It is similarly a federal offense to conspire to violate section 841(a)(1).  *See* 21 U.S.C. § 846.  The DEA was established in 1973 to serve as the primary federal agency responsible for the enforcement of the Controlled Substances Act.

12.     Title 21 United States Code, Section 812 establishes Schedules for controlled substances that present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on it.  Such controlled substances are listed in Schedule I

through Schedule V, depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence.  Controlled Substance Pharmaceuticals are listed as controlled substances, from Schedule II through V, because they are also considered drugs for which there is a substantial potential for abuse and addiction.

13.     Legitimate transactions involving pharmaceutical controlled substances take place within a "closed system" of distribution established by Congress.  Under the "closed system," Title 21 of the United States Code requires that all legitimate handlers of controlled substances (including manufacturers, distributors, physicians, pharmacies, and researchers) be registered with the DEA and maintain strict accounting for all distribution.

14.     Legitimate distributions of controlled substances are limited by the scope of each type of registration.  Title 21 U.S.C. § 802(21) defines a "Practitioner" to include physicians and other medical professionals licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he practices or does research to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research.

15.     Medical professionals, including physicians, must become registered with the Attorney General to be authorized under the CSA to write prescriptions for, or to otherwise distribute or dispense, controlled substances, as long as they comply with requirements under their registration.  21 U.S.C. § 822(b).  Such medical professionals are then assigned a registration number with the DEA.

16.     To comply with the terms of their registration, medical professionals cannot issue a prescription for a controlled substance unless it is "issued for a legitimate medical purpose by an

individual practitioner acting in the usual course of his professional practice." 21 C.F.R.

1306.04(a). Section 1306.04(a) provides that:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Controlled Substances Act (Title 21, United States Code, Section 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions relating to controlled substances.

### Characteristics of Illegal Prescribing Practices

17.     Dosage in one or multiple concurrently prescribed opioids is measured through Morphine Milligram Equivalents ("MME"). MME measures a patient's daily dosage of opioids, based upon a conversion factor of the strength of the opioid (using Morphine as a base of 1) and the quantity of the controlled substance prescribed per day. The United States Centers for Disease Control ("CDC") have medically determined the relative strength of opioids and made the list publicly available.[1] For example: a patient who is prescribed and ingests a single milligram of Morphine once a day will have a 1 MME over the life of the prescription. However, a patient who ingests prescribed Oxycodone (at a conversion factor of 1.5 MME) in the standard prescription of 5 milligram dose four times a day will have a 30 MME over the life of that prescription. Some medical professionals refer to opioid dosage calculations as MED or MEQ. MME, MED, and MEQ are all interchangeable terms that relate to the same calculation.

---

[1] *See Calculating the Total Daily Dose of Opioids for Safer Dosage*, Centers for Disease Control and Prevention (available at https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf).

18.     On August 31, 2016, the Food and Drug Administration ("FDA") issued notice about the danger of concurrent opioid and benzodiazepine prescribing.  In this notice, the FDA explains the dangers of concurrently prescribing opioids, benzodiazepines, and other central nervous system depressants, because concurrent use of these controlled substances can result in coma and even death.  The FDA—noting that opioids alone carry serious risks such as abuse, addiction, overdose, and death—also cited multiple studies confirming these findings, including one which concluded that patients are at ten times higher risk of overdose death through concurrent use of opioids and benzodiazepines.  The FDA strongly warns practitioners to limit these concurrent prescriptions, dosages, and duration of each drug to the minimum possible, due to the danger of patient harm by concurrent dosages.

19.     Title 21 U.S.C. § 841(a)(1) makes it an offense for any person to knowingly and intentionally distribute or dispense a controlled substance except as authorized by law.  Analyzing this issue often turns on the facts of a particular case.  There are, nonetheless, red flags that are indicative of prescriptions that are not issued for a legitimate medical purpose, some of which are discussed below.

20.     From my training and experience, and through consultation with experts in the field, I know that characteristics of illegal pain management clinics or "pill mills" that dispense controlled substance outside the scope of professional practice and not for a legitimate medical purpose include:

    a.   the clinic accepts cash only, or accepts cash as a main method of payment;

    b.   the patients receive prescriptions for the same or similar combinations of controlled substances;

c.  the patients receive no physical examination (or a very cursory examination is conducted);

d.  the doctors at the clinic pre-sign prescriptions for controlled substances;

e.  the physician prescribes or dispenses an inordinately large quantity of controlled substances;

f.  the physician prescribes or dispenses dangerous combinations of controlled substances that appear to have little to no legitimate medical purpose or justification;

g.  the doctors at the clinic fail to treat patients with anything other than controlled substances (e.g., the clinician never recommends physical therapy, surgery, massage therapy, etc.);

h.  the doctors at the clinic fail to heed warnings about patients by others (insurance companies, pharmacists, family members, or clinicians); and

i.  clinics are not certified or accredited under the appropriate state laws.

### Drug Addiction Treatment Act of 2000 (DATA) Waiver

21.  Under the provisions of the CSA, 21 U.S.C. §§ 801–971, the DEA registers medical practitioners who dispense narcotic drugs to individuals for "maintenance treatment or detoxification treatment."  21 U.S.C. § 823(g).  "Maintenance treatment" is defined as the "dispensing, for a period in excess of twenty-one days, of narcotic drugs in the treatment of an individual for dependence upon heroin or other morphine-like drugs."  21 U.S.C. § 802(29). "Detoxification treatment" is defined as the "dispensing, for a period not in excess of one hundred and eighty days, of a narcotic drug in decreasing doses to an individual in order to alleviate adverse physiological or psychological effects incident to the withdrawal from the continuous or sustained

use of a narcotic drug and as a method of bringing the individual to a narcotic drug-free state within such period." 21 U.S.C. § 802(30).

22.     A practitioner seeking such a registration must be qualified and abide by DEA statutes and regulations, as well as the statutes and regulations of the United States Department of Health and Human Services ("HHS"). 21 U.S.C. § 823(g)(1).  Furthermore, the applicant must be qualified and willing to "comply with the standards established by the Secretary [of HHS] . . . respecting the quantities of narcotic drugs which may be provided for unsupervised use by individuals in such treatment."  21 U.S.C. § 823(g)(1)(C).

23.     In 2000, Congress passed the DATA, Pub. L. No. 106-310, 114 Stat. 1222 (codified at 21 U.S.C. §823(g)).   Under the DATA, Congress waived the requirements under section 823(g)(1) for practitioners who dispense and administer narcotic drugs in Schedule III, IV and V (but not Schedule II) for maintenance of detoxification treatment, subject to certain conditions.  21 U.S.C. § 823(g)(2)(A).  Practitioners who obtain a waiver pursuant to section 823(g)(2) are known as "DATA-waived physicians" or office-based opioid treatment ("OBOT") physicians.

24.     Currently, the only controlled substance approved by the FDA for dispensing and administering by OBOT physicians to narcotic addicted patients is buprenorphine, the generic name for Suboxone and Subutex, a Schedule III controlled substance.  42 C.F.R. § 8.12(h)(2)(iii); 21 C.F.R. § 1308.13(e).  In addition, the DATA limits the number of narcotic-addicted patients that can be treated at one time by an OBOT physician to 30, 100 or 275 patients.  21 U.S.C. § 823(g)(2)(B)(iii).  In this instance, MCKENZIE is a DATA-waived medical professional, (DEA Registration #MM4986848), who is authorized to treat up to 275 office-based opioid treatment patients pursuant to the requirements of section 823(g)(2).

### Medical Benefit Programs

25.     MCKENZIE is enrolled as a provider with Medicare and Medicaid and has provided medical services to recipients of Medicare, Medicaid, and other healthcare benefit programs, as that term is defined in Section 24(b) of Title 18, United States Code.

26.     Section 24(b) of Title 18, United States Code, defines a "healthcare benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."  18 U.S.C. § 24(b).

27.     Specifically, Medicare is a federal healthcare program that provides basic medical coverage for persons aged sixty-five and over who are entitled to Social Security Benefits and for persons under the age of sixty-five who suffer from certain disabilities.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.  Individuals who receive benefits under Medicare are often referred to as Medicare "beneficiaries."

28.     Medicare is comprised of four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

29.     Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans.  Such payments are called capitation fees.  The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions.  In addition, in some cases where a sponsor's

expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

30.     Prior to participation in the Medicare Provider Program ("Program") and receipt of a provider number, a provider signs an agreement with the United States.  Upon acceptance into the Program, the provider agrees to submit to certain regulations issued by the United States.

31.     Upon receipt of a Provider Number, the provider can submit claims directly to Medicare.  As part of the provider agreement, the provider agrees to accept the terms and regulations issued by Medicare and the United States.  Providers attest to their responsibility to comply with Federal and Medicare laws and regulations on a recurring basis.

32.     Medicare reimbursement requests for professional services, such as those from a physician for medical services, are made on a Health Insurance Claim Form (Form HCFA 1500). Each claim form submitted for reimbursement requires the diagnosis, date of service, procedure code, type of services provided, charges, name of and provider number for the entity providing the services, and a designation of the selected method of reimbursement.  These forms require the provider to certify that the services on the form were "medically indicated and necessary for the health of the patient" and that the claimed services are true and accurate.  The form further warns that any false claim, documents, or concealing of a material fact may be prosecuted.

33.     Medicaid is a federal health care benefit program designed to provide medical services, equipment, and supplies to certain individuals and families with low income pursuant to the Social Security Act (Title 42, United States Code, Section 1396, *et seq.*).  Medicaid is a health care benefit program as defined in 18 U.S.C. § 24(b).

34.     Submission of a claim to a healthcare benefit program, whether public or private, involves representations by the provider that the services rendered were of a quality that met

professionally recognized standards which include: (1) informed consent; (2) being medically necessary; and (3) being supported by documentation of such necessity.

    **b.**    **Relevant Controlled Substances**

**Opioids**

35.    Opioids are controlled substances that vary from Schedule I to Schedule V, depending on their medical usefulness, abuse potential, safety, and drug dependence profile. Opioids are prescribed by doctors to treat pain, suppress cough, cure diarrhea, and put people to sleep. Effects depend heavily on the dose, how the drug is taken, and previous exposure to the drug. Negative effects include slowed physical activity, constriction of the pupils, flushing of the face and neck, constipation, nausea, vomiting, and slowed breathing. As the dose is increased, both the pain relief and the harmful effects become more pronounced. Some of these preparations are so potent that a single dose can be lethal to an inexperienced user.

36.    Schedule I narcotics, such as heroin, have no medical use in the United States and are illegal to distribute, purchase, or use outside of medical research. In addition, Schedule I drugs have a very high potential for abuse and addiction.

37.    Schedule II controlled substances have a high abuse/addiction potential, yet there is a current medical use in treatment so long as the clinician practices extreme caution. Schedule II opioids include oxycodone, methadone, and morphine.

**Benzodiazepines**

38.    Benzodiazepines are Schedule IV[2] depressants that will put you to sleep, relieve anxiety and muscle spasms, and prevent seizures. Benzodiazepines share many of the undesirable

---

[2] Schedule IV controlled substances have less potential for abuse and addiction than Schedule II controlled substances and have a current medical use. Schedule IV controlled substances can still be abused and are dangerous when prescribed simultaneously to other controlled substances.

side effects of opioids, including tolerance and dependence.  Individuals abuse depressants to experience euphoria.  Depressants are also used with other drugs to add to the other drug's high. Unfortunately, when used in combination with opioids, depressants not only add to the opioid's high, but the combination also increases the potential of negative side effects, such as slowed breathing, known as respiratory depression.  Some examples of benzodiazepines are Valium (Diazepam), Xanax (Alprazolam), and Klonopin (Clonazepam).

39.     Alprazolam, for example, is a generic name for a Schedule IV benzodiazepine prescription drug.  Alprazolam is marketed primarily under the brand name Xanax®.  When used for a legitimate medical purpose, Xanax® is used to treat such conditions as anxiety, depression, and panic disorder.  Alprazolam comes in .25 mg, .5 mg, 1 mg, and 2 mg strengths.  The 2 mg tablets are rectangular in shape and are often referred to on the street as "bars" or "zanny bars." Alprazolam can be addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels.

**Amphetamines**

40.     Amphetamines are stimulants, most often used to treat attention-deficit hyperactivity disorder and narcolepsy.  Because of their high potential for abuse, many amphetamines are Schedule II stimulants.  Prolonged use of amphetamines has a high risk of drug dependence.  Misuse of amphetamine can cause serious cardiovascular issues, as well as death.

41.     Dextroamphetamine-Amphetamine, for example, is a form of Schedule II stimulant prescription drug.  Dextroamphetamine-Amphetamine is marked primarily under the brand name Adderall®.  When used for a legitimate medical purpose, Adderall® is used to treat such conditions as ADHD and narcolepsy.  Dextroamphetamine-Amphetamine comes in 5 mg, 7.5 mg, 10 mg, 12.5 mg, 15 mg, 20 mg, and 30 mg tablets and 5 mg, 10 mg, 15 mg, 20, mg, 25 mg, and

30 mg extended-release capsules.  Dextroamphetamine-Amphetamine can be addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels.

### Buprenorphine

42.     Buprenorphine is a Schedule III medication approved by the FDA to treat Opioid Use Disorder ("OUD") as a medication-assisted treatment ("MAT").  According to the Substance Abuse and Mental Health Service Administration ("SAMHSA"), buprenorphine should be prescribed as part of a comprehensive treatment plan that includes counseling and other behavioral therapies to provide patients with a whole-person approach.  Buprenorphine can be prescribed or dispensed in physician offices.

43.     Buprenorphine is an opioid partial agonist.  It produces effects such as euphoria or respiratory depression at low to moderate doses.  With buprenorphine, however, these effects are weaker than full opioid agonists, such as methadone and heroin.  Because of buprenorphine's opioid effects, it can be misused.  Naloxone is added to buprenorphine to decrease the likelihood of diversion and misuse of the combination drug product.

44.     Buprenorphine products approved by the FDA for treatment of OUD include buprenorphine sublingual tablets (Subutex) and buprenorphine sublingual films (Suboxone), among others.  The main difference between Suboxone and Subutex is that Suboxone contains both buprenorphine and naloxone, while Subutex contains only buprenorphine.  Naloxone is an opioid antagonist, which blocks the effects of opioids at the receptor site.  As a result, based on my training and experience, I know that Subutex is more prone to be abused or diverted.

### c.      Relevant Entities and Individuals

45.     **Lydia McKenzie, DNP, PMHNP-BC**, is a nurse practitioner with specialty in psychiatric mental health and licensed with the State of New Hampshire Board of Nursing (APRN

14

#079038-23, effective December 4, 2018).  MCKENZIE is enrolled as a provider with both Medicare and Medicaid.[3]  She is also registered with the DEA to prescribe controlled substances (DEA Registration #MM4986848) and DATA-waived to treat up to 275 patients for addiction and recovery.

46.    **Scott Parent, LADC, LCS** is a licensed alcohol and drug counselor and licensed clinical supervisor employed by Weeks Medical Center.

47.    **Weeks Medical Center** ("Weeks") is a domestic nonprofit corporation registered with the New Hampshire Secretary of State, with its principal place of business located at 173 Middle Street, Lancaster, New Hampshire 03584.  According to its website, Weeks is a critical-access hospital, offering medical, surgical, 24/7 emergency are, and a variety of specialty services. Weeks also operates inpatient and outpatient clinics, including NCH Patient Care Center Colebrook (a partnership between North Country Healthcare and Weeks Medical Center), located at 181 Corliss Lane, Colebrook, New Hampshire, and Weeks at Mt. Eustis Center, located at 260 Cottage Street, Littleton, New Hampshire.  According to Weeks's website, MCKENZIE practices at each of the above locations.

48.    **Androscoggin Valley Hospital** ("AVH") is a domestic nonprofit corporation registered with the New Hampshire Secretary of State, with its principle office located at 59 Page Hill Road, Berlin, New Hampshire.  AVH operates The Doorway at AVH, located at 7 Page Hill Road, Berlin, New Hampshire.  According to AVH's website, MCKENZIE and LADC Scott Parent staff The Doorway at AVH program, which has nine locations across the state.  The Doorway at AVH is a statewide program, providing substance use treatment.

---

[3] According to Medicare enrollment records, on or about October 22, 2019, MCKENZIE reassigned her Medicare benefits to Littleton Regional Hospital, located at 11 Riverglen Lane, Littleton, New Hampshire.

49.     **Northstar Wellness Associates, PLLC** ("Northstar Wellness") is a domestic professional limited liability company, with its principal office located at 1 Warren Street, Plymouth, New Hampshire.  Northstar Wellness is enrolled with Medicare, with a practice location at 171 Daniel Webster Highway, Unit 11, Belmont, New Hampshire.  According to open-source records, Northstar Wellness provides psychiatry services, specializing in the prevention, diagnosis, and treatment of mental health, emotional, psychotic, mood, anxiety, substance-related, sexual and gender identity, and adjustment disorders.  MCKENZIE is registered with Medicare as a practitioner affiliated with Northstar Wellness.

## III.   PROBABLE CAUSE TO BELIEVE A CRIME HAS BEEN COMMITTED

50.     As set forth below, there is probable cause to believe that MCKENZIE knowingly provided prescriptions for controlled substances to patients without a legitimate medical purpose and outside the usual course of professional practice, and that she also submitted claims to Medicare and Medicaid for medically unnecessary claims.

### Medicaid and Medicare Claims Data

51.     According to a review of Medicare claims data from January 2019 through September 2022, there is indicia that MCKENZIE is engaged in unlawful billing practices and health care fraud.  During this time period, MCKENZIE submitted 3,241 claims for physician services to Medicare for 96 Medicare beneficiaries totaling $711,975, of which Medicare paid $181,819.  Among these claims, MCKENZIE submitted 1,992 claims for procedure code 99214, which is for "established patient office or other outpatient visit, 30-39 minutes."

52.     According to a review of Medicaid claims data from the same time period, MCKENZIE submitted 8,518 claims for physician services 301 Medicaid beneficiaries totaling $934,449, of which Medicaid paid $333,936.  Among these claims, MCKENZIE submitted 6,622

16

claims for procedure code 99214, which is for "established patient office or other outpatient visit, 30-39 minutes."

53.     According to both Medicare and Medicaid claims, on a number of days, MCKENZIE submitted claims to these health care benefit programs (not including commercial insurance plans or private pay patients) representing that she provided over 15 hours of service in a single day.  For example, on October 22, 2019, MCKENZIE submitted claims representing that she provided over 20.5 hours of services.  Based on my training and experience, I know that it is a red flag indicative of fraud when a provider submits claims to health care benefit programs representing total hours of service that extend beyond a typical workday for a provider.

### Expert's Analysis

54.     As part of the Government's investigation into the complaints regarding MCKENZIE's prescribing practices, medical expert Dr. Donald Sullivan, RPh, PhD, ("Dr. Sullivan"), was consulted.  Dr. Sullivan is a Professor of Pharmacy Practice and Science at the Ohio State University.  He is a Professor of Clinical Pharmacy at the Ohio State University College of Pharmacy, and received his bachelor's, master's, and doctorate degrees from the Ohio State University College of Pharmacy.  Dr. Sullivan has been teaching in pharmacology for more than twenty years.  He has received the P3 Distinguished Teaching Award and the Miriam R. Balshone Award for Distinguished Teaching.  Dr. Sullivan has been published in approximately twenty peer-reviewed publications.

55.     As part of the investigation, the Government obtained, in response to a grand jury subpoena to the New Hampshire Prescription Drug Monitoring Program ("NH PDMP"), MCKENZIE's drug monitoring data from approximately January 1, 2020, through October 11,

2022.  Dr. Sullivan reviewed that NH PDMP data, which included 10,671 prescriptions for controlled substances written by MCKENZIE.

56.     Dr. Sullivan opined that MCKENZIE's prescribing practices raised several red flags of prescribing controlled substances outside of the usual course of professional practice and not for a legitimate medical purpose.  Specifically, Dr. Sullivan found: (a) extremely high doses of buprenorphine and buprenorphine-naloxone; (b) several groups or pairs of patients living at the same address who were receiving prescriptions for buprenorphine, including single-ingredient buprenorphine products; (c) extremely high doses of stimulants prescribed in combination with buprenorphine products: (d) single-ingredient buprenorphine prescribed in combination with extremely high doses of stimulants; (e) extremely high doses of stimulants prescribed to patients of advanced age; and (f) benzodiazepines prescribed in combination with buprenorphine products. Below is a summary of some of Dr. Sullivan's findings.

57.     **High Doses of Buprenorphine**.  Dr. Sullivan found that a high percentage of MCKENZIE's patients received prescriptions for single-ingredient buprenorphine, as opposed to the combination product of buprenorphine-naloxone.  As discussed above, clinical guidelines recommend that providers should prescribe the combination product of buprenorphine-naloxone to avoid the potential for abuse and diversion.  Based on my training and experience, I know that single-ingredient buprenorphine (such as Subutex) is more likely to be abused and diverted compared to the combination product of buprenorphine-naloxone (such as Suboxone).  Of the patients that received the single-ingredient buprenorphine product, approximately thirty-two percent received the maximum dose (24 mg of buprenorphine).

58.     According to the FDA, after substance-use treatment induction and stabilization with the combination product of buprenorphine-naloxone, the normal dose for patients is in the

range of 4mg buprenorphine/1 mg naloxone to 24 mg buprenorphine/6 mg naloxone daily.  As Dr. Sullivan notes, dosages higher than 24 mg buprenorphine/6 mg naloxone have not been demonstrated to provide any clinical advantage.  The recommended target dose during maintenance is 16 mg buprenorphine/4 mg naloxone daily.

59.     According to Dr. Sullivan's review of MCKENZIE's NH PDMP data, twenty-one percent of her prescriptions for the combination product of buprenorphine-naloxone were prescribed at the maximum dose (24mg/6mg), while approximately thirty-three percent were prescribed at a dose higher than the recommended maintenance dose (16mg/4mg).

60.     Dr. Sullivan noted that MCKENZIE often prescribed Zubsolv, a combination of buprenorphine and naloxone, which the FDA has approved for use in treatment, stabilization, and maintenance at a maximum dose of 17.2 mg buprenorphine/4.2 mg naloxone per day.  Seventy-five percent of MCKENZIE's Zubsolv patients were at or above the maximum dosage approved by the FDA, with twenty-one percent of patients receiving a prescription that exceeded the maximum dosage approved.

61.     Dr. Sullivan concluded that this indicates that several patients were likely abusing and/or diverting their single-ingredient buprenorphine.

62.     Based on my training and experience and intelligence provided by the DEA, in New Hampshire, a single dose of the combination product (Suboxone) sells on the street for approximately $20, while a single dose of the single-ingredient product (Subutex) sells for approximately $30.  Additionally, I know that users who abuse buprenorphine products often melt the drug and combine it with other drugs, such as Adderall and gabapentin.

63.     **Patients at the Same Address**.  Dr. Sullivan found that there were more than 100 instances in which two or more patients were allegedly living at the same address and receiving

buprenorphine prescriptions from MCKENZIE, including six instances in which each of the patients living at the location received a prescription for the maximum dose.  According to Dr. Sullivan, it is a well-known red flag of abuse and diversion when patients living at the same address obtain prescriptions from the same provider for controlled substances.

64.     **Combinations of Buprenorphine and Amphetamine**.  Dr. Sullivan noted that MCKENZIE often prescribes patients combinations of (a) single-ingredient buprenorphine and stimulants; and (b) the combination product of buprenorphine-naloxone with stimulants.  These combinations would often include both the buprenorphine product and amphetamine prescribed at or above the maximum dosage approved by the FDA.  By way of example, MCKENZIE prescribed one patient both the maximum dosage of single-ingredient buprenorphine and over the maximum dosage of Vyvanse, a type of amphetamine used to treat attention deficit hyperactivity disorder. Dr. Sullivan noted that the combination of a buprenorphine and Vyvanse is known to be commonly abused and/or diverted.  Finally, some of these patients being prescribed amphetamine are of advanced age, such that Dr. Sullivan is concerned that MCKENZIE is placing these patients at "extreme risk" of cardiovascular side effects, including heart attacks.

65.     **Lack of Refills**.  Dr. Sullivan explained that the standard of care, when a provider writes a prescription for buprenorphine, is to limit the amount of buprenorphine that is provided to a patient at any one time.  As a result, most prescribers limit their patient refills to have access to no more than a thirty-day supply of buprenorphine at any given time, in order to prevent abuse and diversion, and to monitor the patient's progress with the treatment.  For most patients, prescribers will write prescriptions for small quantities of buprenorphine with multiple refills, which allows pharmacies to limit the amount of medication the patient receives.  In this manner,

the patient is provided limited access and does not have to return to the physician for a new prescription to obtain a refill as often.

66.     According to the NH PDMP data, MCKENZIE wrote approximately 10,000 prescriptions for Schedule III, IV, and V controlled substances of which approximately 99% did not have a refill.  Dr. Sullivan found this concerning and a red flag of fraud and illegal prescribing practices, as prescribers can issue up to five refills for Schedule III and IV medication, and refills for up to one year for Schedule V medications.  Dr. Sullivan believes that MCKENZIE's lack of refills forced patients to come back to visit her more frequently to obtain prescriptions, which allowed her to charge the patient or bill the patient's insurance plan more frequently.  Many of MCKENZIE's patients were forced to come back to her for a new prescription every seven to fourteen days.  According to Dr. Sullivan, providers involved in diversion and illegal prescribing use this as "the hook" to ensure patients return to the office to increase income.

67.     **Summary**.  In summary, Dr. Sullivan concluded that MCKENZIE's prescribing patterns, as captured in the NH PDMP data, raise well-known red flags indicative of the provider both prescribing controlled substances outside of the usual course of medical practice and committing insurance fraud.

68.     Exhibit 1, which lists the specific patient electronic health records that the Government requests, includes the names of patients that Dr. Sullivan concluded that MCKENZIE prescribed controlled substances to outside of the usual course of professional practice and not for a legitimate medical purpose.

## AmeriHealth Referral

69.     AmeriHealth Caritas New Hampshire ("AmeriHealth") is a Medicaid managed care organization, which delivers New Hampshire Medicaid health benefits and additional services

through contracts between the New Hampshire Department of Health and Human Services and managed care organizations or Medicaid Health Plans.  MCKENZIE is a provider enrolled with the New Hampshire Medicaid program.

70.    On May 22, 2020, Data Analytics personnel at AmeriHealth submitted a referral to the Fraud Tip mailbox at AmeriHealth regarding MCKENZIE for excessive billing.  Based on certain algorithm results, MCKENZIE was identified as the top-paid individual provider in Q4 of 2019 and the third highest on Q1 of 2020 related to certain billing practices.  She was also the second-highest-paid provider related to other criteria.  Over the next seven months, AmeriHealth conducted an investigation into certain claims tied to MCKENZIE.

71.    On December 15, 2020, an investigator at AmeriHealth's Special Investigation Unit issued a "Final Investigative Report" related to AmeriHealth's investigation.  As part of the investigation, AmeriHealth requested and obtained certain documents from MCKENZIE's practice, and a clinical investigator conducted a clinical review of the produced files.  Following the clinical review, AmeriHealth made the following findings:

    a.   MCKENZIE did not submit any evaluations or treatment plans.  Both are requirements for substance use disorder ("SUD") treatment, regardless of level of care.  The evaluation is used to verify/determine level of care placement and then build the treatment plan based on the assessed needs.

    b.   Progress notes did not contain a start/stop time.  While the manuals provided do not explicitly state this is a requirement, the SUD manual indicates that treatment modality and duration is a progress note requirement.  These notes contain a patient check in time (on some not all).  This does not provide clear determination on when the member was seen or for how long the provider spent with the member.  99214 is a timed code (25 minutes).

    c.   There was little to no coordination between the prescribing medication assisted treatment ("MAT") clinician (MCKENZIE) and the clinical team providing counseling services.  This was both when the member was receiving counseling with the MAT provider and even less when the member was being seen for counseling with another agency.  This was listed

as a requirement in all manuals provided both by the State of New Hampshire and the plan.

d.  It is noted that at least two patients were given gift cards for remaining in the program for a specific period of time (6–9 months). This was unethical. It persuades members from having provider choice. Both of these members were also highly non-compliant. Ongoing positive urine drug screens for illegal substances and negative for buprenorphine which was the purpose of treatment.

e.  It is unclear what the provider was using to determine schedule of prescribing. Typically in a traditional SUD MAT program you start receiving weekly prescriptions and as you maintain sobriety and show increased wellness (employment, family stability, housing, etc.) these prescriptions are increased to longer increments such as every two weeks then monthly. It is typical that it would not go longer than monthly. Out of the 13 members reviewed there was only one member that was seen monthly. The other 12 members had inconsistent increments and when they had positive urine drug screens for illegal substances they were given 3, 4 or less day prescriptions. The members where ongoing positive urine drug screens for illegal substances occurred, were never placed on contracts or discontinued from services despite clear evidence to support a discharge or transfer to a higher level of care.

72.  Ultimately, AmeriHealth determined that 187 of the 188 claims reviewed were not supported by the medical records. Based on the results of this investigation, AmeriHealth determined that MCKENZIE received over $22,000 overpayments as the claims submitted were not eligible for reimbursement.

## MFCU Undercover Operations

73.  AmeriHealth referred the matter to the New Hampshire Attorney General's Office, Medicaid Fraud Control Unit ("MFCU"). As part of their investigation, MFCU conducted undercover operations involving MCKENZIE and her practice. On September 14, 2021, the MFCU obtained an order from the Merrimack County Superior Court (*Shulman,* J.) authorizing the placement of undercover agents or informants into MCKENZIE's practice, and the MFCU

referred the investigation to the Drug Task Force ("DTF") to place an undercover officer into MCKENZIE's drug treatment programs disguised as a New Hampshire Medicaid member.

74.     As part of the operation, the MFCU obtained a Medicaid card for DTF's undercover agent ("the UC") in the name of Robert Lane.  The MFCU also obtained an order from the Merrimack County Superior Court authorizing DTF to obtain a quantity of synthetic urine, which would not test positive for buprenorphine.

75.     On August 2, 2022, the UC presented to MCKENZIE's practice at AVH, located at 7 Page Road, Berlin, New Hampshire, posing as a new patient seeking treatment for opioid addiction.  The UC made contact with one of MCKENZIE's staff, Heidi Richard, who became the UC's case manager.  The UC told Richard his backstory regarding addiction, and he provided his undercover Medicaid card and driver's license.  He underwent a brief medical screening, and the UC and Richard talked about Suboxone outpatient therapy.  Richard told the UC that MCKENZIE was out of the office that week.  Richard attempted to contact an offsite prescriber to get the UC a prescription and set an appointment for the following week.  Richard also instructed the UC that the UC had to choose between one of two pharmacies (Walgreens or Walmart), to which the UC preferred Walgreens.  Based on my training and experience, it is highly unusual and a red flag of illegal prescribing practices for the provider to instruct the patient on the exact pharmacy to fill a prescription.  Richard then informed the UC that if the UC's medication was lost or stolen the UC had to file a police report as they would not replace the prescription without such a report.

76.     On August 3, 2022, AVH contacted the UC and informed the UC that the UC had an appointment the following day at 2:00 p.m. to meet with LADC Scott Parent.  At that time, the UC met with Parent for over an hour and discussed an outpatient treatment plan.

77.     On August 12, 2022, the UC appeared at AVH for an appointment with MCKENZIE.  After being in the AVH lobby for a few minutes and undergoing an initial screening, the UC met MCKENZIE.  She presented the UC with options for prescription treatments and decided on treating the UC with buprenorphine (Suboxone).  The UC was told to give a urine sample for analysis, and the UC did so with the synthetic urine.  The UC retained a portion of the synthetic urine as a control sample.   After the synthetic urine was tested, MCKENZIE commented that it was odd that the test result was negative for controlled substances.   Nevertheless, MCKENZIE prescribed the UC with two doses of Suboxone per day for one week and wrote a prescription for a total of fourteen Suboxone strips.  The UC was also given a takeaway kit that contained a CPR mask, drug testing strips, a box of nasal Narcan, and another prescription for nasal Narcan.  The UC filled the prescriptions at Walgreens located in Berlin, New Hampshire.

78.     On August 19, 2022, the UC had a second appointment with MCKENZIE.  Again, the UC provided synthetic urine when subjected to a urine drug screening.  The UC also reported to MCKENZIE that, after using one Suboxone strip from the prescription, the remainder of the Suboxone strips were stolen or misplaced.  MCKENZIE asked the UC if he had filed a police report, and the UC responded that he had not as he suspected either his wife or his child of stealing or diverting the prescription.  MCKENZIE was silent as to whether the UC's urine was clean. Despite the clean urine test and the diverted prescription, MCKENZIE issued another prescription to the UC for Suboxone.  According to Medicaid claims data, MCKENZIE submitted a claim for the office visit with the UC under code 99214 (an established patient office visit between 30–39 minutes).  The UC's appointment with MCKENZIE lasted approximately nine minutes.

79.     On August 26, 2022, the UC had a third appointment with MCKENZIE as well as an appointment with LADC Parent.  Again, the UC provided synthetic urine when subjected to a

urine drug screening.  The UC then told MCKENZIE that he ingested all of the doses of his Suboxone prescription as directed.  MCKENZIE noted, however, that the urine drug screening was clean.  In response, the UC stated that he drank Vitamin Water when taking Suboxone because the strips tasted bad (an implausible justification for the clean urine drug screen results). MCKENZIE stated the drink must have diluted the Suboxone, which rendered it undetectable. MCKENZIE again issued the UC a Suboxone prescription, but, upon the UC's request, increased the prescription to a fourteen-day supply. According to Medicaid claims data, MCKENZIE submitted a claim for the office visit with the UC under code 99214 (an established patient office visit between 30–39 minutes).  The UC's appointment with MCKENZIE lasted approximately ten minutes.

80.     On September 9, 2022, the UC attended another appointment at the Doorway at AVH.  The UC again provided synthetic urine when subjected to a urine drug screening.  The UC was screened and then met with MCKENZIE.[4]  MCKENZIE asked the UC if he was using the Suboxone every day, which the UC answered "yes."  MCKENZIE asked how it made the UC feel, to which the UC answered that he was still craving heroin.  MCKENZIE agreed to increase the dosage and also recommended prescribing him Hydroxyzine[5] to help him sleep at night and to assist with anxiety.  During the visit, MCKENZIE did not question the negative drug screening results.  Again, according to Medicaid claims data, MCKENZIE submitted a claim for the office visit with the UC under code 99214 (an established patient office visit between 30–39 minutes). The UC's appointment with MCKENZIE lasted approximately six minutes.

---

[4] A nurse took the UC's vitals and stated that the UC had a blood pressure of 190/80, which the UC found to be unusual.  After the visit, the UC checked the UC's blood pressure using an Omron 3 Series Blood Pressure Monitor, which measured 123/79.

[5] Hydroxyzine is an antihistamine, which is generally used to treat allergic reactions and anxiety.

81.     In total, MCKENZIE issued four prescriptions to the UC for controlled substances to purportedly treat substance use disorder; however, the UC tested negative for both illicit drugs and the prescribed medication on each and every occasion.

82.     Based on my training and experience, I know that if drug screens are negative for prescribed controlled substances, then the patient is not taking the medication as prescribed and may be diverting the controlled substance.  When the provider continues to prescribe the controlled substance, even after confirming that the patient is not actually taking the medication, then the prescription is outside the usual course of professional practice and not for a legitimate medical purpose.  Additionally, such a prescription, the office visits, and any related services billed to a health care benefit program are not medically necessary and may constitute fraudulent claims.

83.     The identifying information associated with the UC's visits with MCKENZIE are included among the requested records in Exhibit 1.

### Evidence of Patient Diversion

84.     According to the NH PDMP and claims data records, between January 2020 and November 2022, MCKENZIE prescribed Patient #1 Suboxone and clonazepam.  During this same time period, according to the NH PDMP, Patient #1 received prescriptions for controlled substances from approximately fifteen other providers, which included prescriptions for Adderall, hydrocodone, methylphenidate, clonazepam, and Suboxone.  Additionally, Patient #1 received controlled substance prescriptions from MCKENZIE while another patient that lived at the same address also received controlled substance prescriptions from MCKENZIE.  As mentioned above, this is a red flag for illegal prescribing practices.

85.     On August 19, 2019, Patient #1 was convicted of one misdemeanor count of violating New Hampshire RSA 318-B:26, III(a) for knowingly controlling a premises where

Patient #1 knew a controlled drug (Suboxone) was illegally kept or deposited.  The crime occurred on August 1, 2018.  Patient #1 received a twelve-month jail sentence, which was suspended for two years, subject to good behavior and other conditions.  Despite this prior conviction and instance of diverting controlled substances as well as the other red flags, MCKENZIE has continued to prescribe controlled substances to Patient #1.

86.     According to PDMP and claims data records, between January 2020 through November 2022, MCKENZIE prescribed Patient #2 Suboxone.  Previously, on July 1, 2019, Patient #2 was convicted of one count of violating Title 21, United States Code, Section 841(a)(1) (Distribution of a Controlled Substance – Suboxone).  The crime occurred on November 15, 2018, in Colebrook, New Hampshire.  According to an affidavit supporting the underlying criminal complaint, Patient #2 sold Suboxone strips for $170 to a confidential source working with law enforcement.

87.     On December 2, 2022, agents interviewed Pharmacist #1, a pharmacist working at a Walgreens located in Colebrook, New Hampshire.  Pharmacist #1 was familiar with MCKENZIE and stated that Pharmacist #1 did not have any immediate concerns regarding MCKENZIE's prescribing practices.  However, Pharmacist #1 informed agents that Pharmacist #1 has refused to fill Suboxone prescriptions MCKENZIE issued to Patient #2 because Pharmacist #1 was aware that the patient had previously sold Suboxone to a DEA agent in the parking lot of the pharmacy.  Pharmacist #1 was also aware that Patient #1 was involved in diverting drugs to the DEA.  Pharmacist #1 explained that the pharmacy no longer filled Patient #1 prescriptions.

88.     Additionally, Pharmacist #1 stated that a representative from the Doorway at Weeks Medical Center called Pharmacist #1 and asked Pharmacist #1 to fill the Suboxone

prescriptions for Patient #2.  Pharmacist #1 stated that Pharmacist #1 did not feel comfortable filling these prescriptions based on the patient's prior diversion.

89.     Patient #1 and Patient #2 are included among the list of requested patient electronic health records included in Exhibit 1.

## IV.   PROBABLE CAUSE THAT EVIDENCE IS LOCATED AT TARGET LOCATION (eClinicalWorks)

90.     On December 8, 2022, eClinicalWorks ("eClinical") provided subscriber and billing information to the Government in response to a grand jury subpoena.  According to the returned records, MCKENZIE, through Weeks Medical Center, has a "Providers" account with eClinical.  These records from eClinical indicated that MCKENZIE's account was opened in 2017 with a 24-month fee waiver.  The account remains active and listed MCKENZIE's billing information as Weeks Medical Center, 173 Middle Street, Lancaster, NH 03584, one of her current practice locations.

91.     In general, an electronic health record ("EHR") is a digital version of a patient's paper medical chart, which includes, among other things, prescription information, medical services and tests provided, the medical provider rendering the services, and the billing information.  Companies, such as eClinical, give healthcare providers access to EHR software.  According to eClinical's website, the company has over 150,000 healthcare providers using their EHR software.[6]

92.     Additionally, the eClinical subpoena returns state that MCKENZIE has paid, through Weeks Medical Center, $724,030.23 since January 1, 2019, for software functions that include refill requests from patients and patient medical intake history.

---

[6] https://www.eclinicalworks.com/ (last visited January 27, 2023).

93.     Based on the foregoing, there is probable cause to believe that computers and servers located at **TARGET LOCATION** are likely to contain stored EHR and related records associated with MCKENZIE's eClinical account.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to determine what services were rendered, who rendered the services, and whether the services were medically necessary in light of what has been included in the patients' medical record.

94.     Based on the foregoing, there is probable cause to believe that evidence, fruits, and instrumentalities related to the **TARGET OFFENSES** will be located within the **TARGET LOCATION** (as more fully described in Attachment A).

## V.   <u>CONCLUSION</u>

95.     Therefore, I respectfully request that the Court issue the proposed search warrant. Because the warrant will be served on eClinical, who will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

96.     Pursuant to 18 U.S.C. § 2703(d), the presence of a law enforcement officer is not required for the service or execution of these warrants.

/s/ Tyler Gagne

_____
Tyler Gagne, Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me   via telephone conference.

This _____8th_____ day of February, 2023.

_____
HONORABLE ANDREA JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

### **Property to be Searched**

This warrant applies to information associated with the accounts listed ("SUBJECT ACCOUNTS") below that are within the possession, custody, or control of eClinicalWorks (the "PROVIDER"), a company that accepts service of legal process at 2 Technology Drive, Westboro, MA 01581, regardless of where such information is stored, held, or maintained.

Name:              Lydia McKenzie

Account Name:      Weeks Medical Center

**ATTACHMENT B**

**Particular Things to be Seized**

I.   **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

To the extent that the information described in Attachment A is within the possession, custody, or control of eClinical (the "PROVIDER"), regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each of the SUBJECT ACCOUNTS listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, for the patients listed in the Attachment A, including:

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNTS, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.   All records or other information stored by an individual using the SUBJECT ACCOUNTS, including:

(I)   All patient clinical files and/or medical records, including, but not limited to, documents and records relating to intake, assessment, clinical documentation, patient visit notes, certification of terminal illness, plan of care, interdisciplinary team ("IDT") meetings, charts, schedules, notes, prescriptions, and electronically signed forms.

(I)    All records showing the preparation of medical records including, but not limited to, scheduling of employees, timecards, daily route sheets, partially completed forms, pre-printed forms, pre-signed blank forms, and evidence of the sending or sharing of such documents with other persons or receipt of such documents from other persons.

(II)    All records related to Medicare billing and eligibility including, but not limited to, multi-service line billing, direct billing to Medicare, and Medicare patient eligibility verification logs.

(III)    All records of any inspection, review, audit, or inquiry by any other Medicare contractor, and all memoranda, notes, correspondence, and emails concerning any such inspection, review, audit, or inquiry.

ii.    All records of communications between individuals using the SUBJECT ACCOUNTS, including "one-on-one messaging" and "secure group messaging."

iii.    All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNTS, including contacts with support services and records of actions taken.

iv.    For all the foregoing records, records and data related to the original records, including the identities of the individual that authored the original record, all modifications to any record, and the identities of the individuals who made the modifications to the records.

b.    All other records and information, including:

i.    All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated

with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)    the SUBJECT ACCOUNTS.

ii.    All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNTS described above, including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dialups, and locations, and including specifically the specific product name or service to which the connection was made.

## II.   **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

For the SUBJECT ACCOUNTS listed in Attachment A, the search team may seize:

a.    All information described above that constitutes evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1347 (health care fraud); and/or Title 21, United States Code, Section 841(a)(1) (illegal drug distribution), namely:

i.    Information relating to who created, accessed, or used the SUBJECT ACCOUNTS, including records about their identities and whereabouts.

ii.    Information related to how and when the SUBJECT ACCOUNTS were accessed or used.

iii.     All emails, communications, or messages to or from patients, or pertaining to patients.

iv.     All clinical files and patient records for all Medicare and Medicaid patients.

v.     All records showing the preparation of medical records, such as daily route sheets, partially completed forms, pre-printed forms, pre-signed blank forms, and evidence of the mailing or sharing of such documents with other persons or receipt of such documents from other persons for Medicare and Medicaid patients.

vi.     Medicare and Medicaid billing and payment files and supporting documentation.

vii.     Correspondence with Medicare, Medicaid, or any Medicare or Medicaid contractor or administrator, relating to Medicare or Medicaid patients or billing; correspondence and communications with billing services, consultants, advisors, and other persons about the proper preparation and submission of claims or supporting documentation to Medicare or Medicaid; and billing manuals, bulletins, newsletters, articles, notices, memoranda, lists of procedure codes, price sheets, copies of rules or regulations, and instructions or directions relating to billing Medicare or Medicaid.

viii.     Medicare or Medicaid patient eligibility verification logs; lists of marketers and other referral sources; timecards and route sheets; lists of patients identifying the referral source of any Medicare or Medicaid patient; and memoranda, notes, correspondence, emails, lists, logs, ledgers, and other records identifying the referral source of any Medicare or Medicaid patient.

ix. Any memoranda, notes, correspondence, lists, logs, ledgers, or other records reflecting payments made, in cash or in kind, or other consideration given to marketers or other patient referral sources.

x. Memoranda, notes, correspondence, lists, logs, ledgers, and other records reflecting payments made, in cash or in kind, or consideration given to any Medicare or Medicaid patient.

xi. Contracts with medical clinics, consultants, home health agencies ("HHAs"), and others providing services under arrangement; invoices from and records of payment to such entities; and supporting documentation for such invoices and payments.

xii. Records of any inspection, review, audit, or inquiry by National Government Services or any other Medicare or Medicaid contractor, and memoranda notes, correspondence, and emails concerning any such inspection, review, audit, or inquiry.

xiii. All scheduling, client relations management, and marketing records and information pertaining to patients.

xiv. All employee management information and records identifying employees, contractors, and volunteers.

## III. **PROVIDER PROCEDURES**

IT IS ORDERED that the PROVIDER shall deliver the information within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

Special Agent Robert Ames
U.S. Department of Health and Human Services
Office of the Inspector General
JFK Federal Building, Suite 2475
Boston, MA 02203
Telephone: (617) 686-4616
Email: Robert.ames@oig.hhs.gov

IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

IT IS FURTHER ORDERED that the PROVIDER shall produce all files in their original, unchanged, native file formats[7] and provide detailed instructions enough to enable law enforcement and/or those assisting law enforcement to access and retrieve the information described above.  If the files are not capable of being translated into a commercially available program, the PROVIDER shall produce any software, software manuals, and instructions to enable law enforcement and/or those assisting law enforcement to access the information described above in Section I.

---

[7] The following is a non-exhaustive list of examples of native file formats: Microsoft Excel, Microsoft Access, Microsoft Outlook, Microsoft Word, Corel Word Perfect, and Adobe PDF.

## Exhibit 1: Particular Patient Files to be Seized

Patient initials and corresponding full names from the SUBJECT ACCOUNTS.   An asterisk (*) indicates the patient lives at one of six addresses where MCKENZIE has prescribed the maximum dose of a buprenorphine-containing medication for every patient living at the same address.  An exclamation mark (!) indicates patients whose prescriptions Dr. Sullivan has flagged as "most problematic":

1.  P.C. = Peter Carney

2.  C.H. = Crystal Harding

3.  C.H. #2 = Crystal Howland

4.  A.L. = Amanda Lampron

5.  A.L. #2 = Amy Levesque

6.  S.L. = Sylvia Lewis

7.  D.A. = Donavan Aubin

8.  E.B. = Evan Brazier

9.  B.F. = Brittany Farrow

10.  J.B. = Jamie Butler

11.  C.O. = Cheryl Onduso

12.  K.V. = Kami Valeriani*

13.  J.D. = Joseph Desmarais*

14.  R.E. = Roxanna Edwards*

15.  R.G. = Ronnie Gable*

16.  C.H. #3 = Christina Harrelson*

17.  J.H. = Jeremy Hood*

18.     J.L. = Jonathan Lugg*

19.     A.M. = Alyssa Macleod*

20.     C.M. = Crystal Monroe*

21.     K.P. = Kevin Prestin*

22.     T.P. = Terri Prestin*

23.     R.V. = Richard Valeriani*

24.     S.M. = Shontay McKinnon

25.     R.T. = Robin Theriault

26.     F.F. = Franklin Frenchman

27.     V.D. = Vanessa Dyer

28.     K.R. = Katie Ricker

29.     A.T. = Andrea Turmel!

30.     K.B. = Kimberly Black!

31.     M.B. = Mark Boxall!

32.     A.C. = Alice Carlson!

33.     P.C. #2 = Patricia Cote!

34.     B.C. = Brandilee Cottrell!

35.     A.F. = Aisha Fekay!

36.     R.F. = Richard Flanders!

37.     K.F. = Kimberly Ford!

38.     K.G. = Kristi Grimard!

39.     T.H. = Tanna Halvorsen!

40.     A.K. = Amy Kulsic!

41.     S.M. #2 = Stephanie Marshall!

42.     S.M. #3 = Sarah Miller!

43.     A.P. = Albert Pichette!

44.     T.R. = Travis Raymond!

45.     S.V. = Stacey Vaughn!

46.     R.L. = Robert Lane

47.     R.W. = Robert Weeks